## DELINQUENCIES OF MEMBERS OF MUTUAL BENEFIT ASSOCIATIONS.

[Circuit Court of Cuyahoga County.]

W. H. SCHWARTZ, ADMINISTRATOR, ET AL V. THE ST. ELIZABETH ROMAN AND GREEK CATHOLIC UNION ET AL.

Decided, March 4, 1907.

*Mutual Benefit Societies—Death Benefits—Delinquency of Deceased Member—Custom of Society—Evidence—Charge of Court—Action of Husband for Wife with Reference to Membership.*

1. Membership in a mutual benefit society can not be forfeited, against the will of the member by delinquency, *ipso facto*; but he must first be given an opportunity to justify himself, and this must be followed by some action by the society looking to a severance of relations between the society and the member.

2. A charge of court, which assumes that because a husband acted for his wife in applying for membership for both himself and his wife in a mutual benefit society, any false representations which he may have made with reference to his own age, etc., affected equally the membership of his wife, is erroneous.

MARVIN, J.; WINCH, J., and HENRY, J., concur.

Error to the court of common pleas.

The parties here are as they were in the court below. The administrator of the estate of Maria Kohanczo, deceased, her husband and children, are the plaintiffs, and the defendants are the St. Elizabeth Roman and Greek Catholic Union, and the several officers of said union. The union is an unincorporated beneficial association, organized in August, 1903, with the following constitution and by-laws:

"THE CONSTITUTION AND BY-LAWS OF THE ST. ELIZABETH ROMAN AND GREEK CATHOLIC UNION.

"CHAPTER I.

"*Name, Seat and Aims of the Union.*

"Paragraph 1. The name of the union, which can not be changed while the union is in existence, will be in existence is St. Elizabeth Roman and Greek Catholic Union.

"Paragraph 2. The seat of the union is Cleveland, Ohio. The seal of the Cleveland Union contains the following inscription: 'St. Elizabeth's Roman and Greek Catholic Union.'

"Paragraph 3. The aim of this union is the Roman and Greek Catholics who emigrate to America from Hungary or who were born in this country from Hungarian parents, who keep these rites or who direct the rites according to the rules and regulations of the Catholic faith, to promote their attachment to the native branch, and to aid after the decease of its members, their widows and orphans, with a sum of money as specified in these by-laws.

"CHAPTER II.

"*Rights and Duties of Members.*

"Paragraph 4. Any native Roman or Greek Catholic Hungarian man or woman will be admitted as a member of this union who has reached his or her age of 16 years and is not older than 50 years old.

"Such persons who have been punished before or who are fugitives from justice can not be elected as members of the union.

"If a member got into the union by false allegations or false data, and it is found out that, for instance, he is a fugitive of justice, he will be expelled from the union.

"Paragraph 5. Local people or people living in this city, can report their intention of joining the union by a regular member. Only branches consisting of at least 25 members will be accepted as out-of-town members by the union.

"The trustees of the out-of-town branches are the heads of such branches.

"The union reserves its rights always to supervise such trustees and officers of the union, and these trustees are responsible for their branches.

"Should there be any complaint against a prospective member or a branch this has to be taken before the meeting and the meeting will decide about this complaint.

"Paragraph 6 (second section):

"If the prospective member of branch fully answers the prescriptions of Paragraph 4, they may be admitted into the union.

"Paragraph 7. Every member after receiving two votes shall be a member and has the right to vote immediately after being admitted, but can only be elected officer after a membership of six months.

"Paragraph 8. · The initiation fee shall be: From 16 to 25 years, $1.30; from 25 to 35 years, $1.40; from 35 to 45 years, $1.50; from 45 to 50 years (not yet reached).

"Paragraph 9. From the money paid in advance to the secretary from the initiation fees, one dollar shall constitute the capital of the union; the rest shall cover the expenditures of the union.

"Paragraph 10. Every member has to pay into the treasury of the union thirty cents semi-annually; the money so collected shall be used for the expenditures of the union, i. e., for the official organ, hall rent, fitting up the office, etc. The money left after such expenditures shall be added to the capital of the union.

"Paragraph 11. After the decease of any member of the union, the heirs shall receive as many dollars as the union has members.

"In case of total disability, that is, if a member lost one arm, one leg or both eyes, such member has to report the accident to the board of officers of the union. The board of officers shall thoroughly examine the case and if the total disability was proved, such member shall get as half death benefit as many fifty cents as the union has members. Both the death and the accident benefit will be paid by the members, in such a way that if a member of the union died or was found totally disabled by the board of officers, every member must pay the one dollar death assessment, respectively, the 50 cents accident assessment to the treasurer of the union within fourteen days.

"Paragraph 12. Should a member fail to pay the death benefit dollar after the decease of a fellow-member, then, in case of his death, his heirs could not claim any death benefit from the union.

"Paragraph 13. Should a member of the union remove from the seat of the union and should he want further to remain a member, then he must report his moving to the president or secretary. Anyone failing to do so will not be considered a member of the union any longer.

"Paragraph 14. Members living remote from the seat of the union are submitted to all duties prescribed by the laws of the union.

"Paragraph 15. If a member quits the union and wants to join it again, he can only be accepted as a new member.

"Paragraph 16. If any member of the union, for any cause whatever, insults the union or causes any damage to the same, then he shall be expelled from the union, and only in such case can he be re-taken, if he acknowledges his mistake and apolo-

gizes to the union and if the apology was accepted, he reimburses the union for the damage caused by him.

"Paragraph 17. Expelled members lose all their rights against the union and can not even appear at the meetings of the union.

"The members who quit or were expelled, can not claim any damage whatever or the re-payment of the moneys paid in by them.

### "CHAPTER III.

#### "*Election of Members and Officers.*

"Paragraph 18. Such persons who want to join the union must be recommended by regular member and must prove the state of their health by a physician's certificate, which they must present to the secretary.

"Paragraph 19. The union shall hold a regular meeting every month and the members will be notified of the time of such meeting by the official organ.

"Paragraph 20. The officers shall be elected for one year and it is their duty to act with the branch organization according to the best conscience in the interests of the union. Should any officer go into business then he must resign his office.

"Paragraph 21. Only such persons can be elected officers who can read and write Hungarian and who are artisans or tillers of the soil in the old country."

On the 6th of December, 1903, Maria Kohanczo and her husband, George Kohanczo, became members of this union. At the time they so became members they each paid to the union $1.30.

On the 7th day of May, 1904, the said Maria Kohanczo died, and this suit was brought to recover the amount provided by the laws of the union to be paid to the families of those dying, while members of the association.

The defense was made on the ground that Maria Kohanczo, at the time of her death, was not a member of the association:

First. Because it is said in the answer she made false representations as to her age when she joined.

Second. That she was not a member of a Greek or Roman Catholic Church in good standing at the time she joined, and that she falsely and fraudulently represented that she was such member of the church.

Third.   That she was in arrears for dues to the amount of 30 cents, payable on the 1st day of January, 1904.

As to the first of these grounds, it was abandoned at the trial, as no evidence was introduced tending to support it.

As to the second, evidence was introduced tending to show that the deceased, at the time of her death, was not a member of the church conducting herself according to its rites, and that she had neglected her obligations as a member of the church of which she had been a member.   This evidence, however, is confined to the time of her death, or so near to it that it can not be said to establish that she was not such church member, as to make any such representations she made in that regard false at the time she joined the union.

As to the third, it is claimed by the plaintiff in error that at the time the deceased became a member of the union, the $1.30 paid was made up of $1 initiation fee and of 30 cents for semi-annual dues, paid in advance.   The deceased at the time she became a member of the union was more than 45 years of age, and it will be noticed that the amount to be paid as an initiation fee for one above the age of 45 years is not fixed by the by-laws, nor is the date of payment of the semi-annual dues fixed by such by-laws, the provision as to it simply being that 30 cents shall be paid semi-annually by each member; but the secretary testifies that at the time the husband of the deceased made application for membership for himself and his wife, he was notified that the $1.30 was all as an initiation fee, and that the semi-annual dues would be payable in January and July of each year.   It is claimed, too, on the part of the defendant in error that a custom had been established by which the semi-annual dues became payable on the 1st day of January and July of each year; but as the union was organized in August, 1903, and this deceased joined the union in December of the same year, no custom could well have grown up at that time for payment in January and July, because the union had not yet been in existence sufficiently long; and, at the time of her death, but one of the dates on which these semi-annual dues would become payable, as claimed by the secretary, had passed, so that it could hardly be said that any custom had been established, nor does it appear anywhere

that the union had authorized the secretary to say that these dues should become payable on the 1st day of January and July, or that they were to be payable in any particular months. However, as the secretary was the officer to whom the application was made, and as he says he notified the husband that these dues would be payable on the dates specified, the defendant in error is perhaps warranted in the claim that as to this decedent, those were the fixed dates on which payment should have been made.

Among the provisions of the by-laws, it will be noticed that an official organ for the union was established, and that the members of the union were required to accept notices published in such official organ. The only action taken by the union, looking to the expulsion of the deceased from the association, consists of the following:

On the 30th of April, 1904, a letter was sent to George Kohanczo, the husband, which reads as follows:

"St. Elizabeth's Roman and Greek Catholic Union.
"Organized, July 12, 1903.

"Cleveland, Ohio, April 30, 1904.

"*Dear Fellow Member, George Kohanczo:*

"You and your wife were reported at the meeting of the union that you joined the union by falsehood. You are not forty-eight years old, but surpassed the 51 years, too. Therefore, clear yourself and your wife with birth certificate within eight days. If you fail to do so, then you will be scratched [expelled; both parties will agree when I use the word expelled]; then you will be expelled from the union by resolution adopted at the meeting; and, therefore, you can not claim anything from the union. You have lost all your rights.

"Joseph Nameth, *Secretary,*
"77 Bismark."

It will be noticed that this letter charges that both the husband and wife were reported at the meeting of the union as having joined the society by falsehood, but the falsehood applies to the husband alone, no suggestion being made that any misrepresentation was made as to the age of the wife.

On the 1st day of May, 1904, at a meeting of the union, the minutes show that "Nine members were elected in the union,

two were scratched, George Kohanczo and his wife, because he declared in the presence of one controller that he already was older than the by-laws prescribe."

· These minutes are in the Hungarian language, and the translator explains that the word "scratched" as used, indicates that these parties were either suspended or expelled; but, as has already been stated, there was no evidence tending to show, nor was it claimed on the trial, that this woman was liable to expulsion because of her age; nor is it claimed that because of this resolution she ceased to be a member of the union, but really that she ceased to be because of non-payment of the dues for January, 1904. That this rule requiring payment was not regarded as so inviolable that one ·ceased to be a member simply because of the failure to pay at the date, is manifested from the further minutes of the meeting, at the date already named, the language referred to being the following: "Further, the secretary was ordered to warn the members in arrears, through the official organ, by notice. This was done." The very day on which this resolution was passed the society recognized that one might. be in arrears for dues and still be a member until some further action was taken.

On the 7th day of April, 1904, notice was published in the official organ, reading as follows:

"Such members of the St. Elizabeth's Union who still have not paid the 25 cents semi-annual dues, which were due in the month of January, are *warned* that they fulfill such obligation by all means until the meeting to be held on the 10th of this month, otherwise they can not claim any benefit at all."

As to this notice, it will be observed that the amount specified as payable is 25 cents instead of 30 cents, and also that there is here a recognition that one may be in arrears for dues and still be a member. It comes then to this: That either Mrs. Kohanczo was a member of this union at the time of her death, or that she ceased to be a member for non-payment of dues, without any action of the union expelling her on that account. The law does not favor forfeitures, and we do not understand that without some action of the union, one who was a member in

good standing, could against his will cease to be such member without having had an opportunity to justify himself, and certainly not without some action taken by the union, looking to the severing of the relations between the union and the member.    See *Grand Lodge* v. *Brand,* 29 Nebraska, 644, and the 3d American & English Ency. (Vol. 3), pages 1086 and 1087, note 1 of which reads:

"Where a suspension for non-payment of dues is provided for in the laws of the association, and it is also provided that such suspension shall work a forfeiture of benefits, the fact of delinquency alone does not, *ipso facto,* work a forfeiture; a suspension by formal proceedings is necessary."

A large number of authorities are cited in support of this proposition.

The charge of the court in this case is complained of, and is subject to the criticism that the court seemed to assume that because the husband acted for his wife in the matter of applying for membership and negotiated the joining of the union, that whatever he did with reference to his own membership applied equally to what he·did with reference to his wife's membership.    An example of this is found in these words of the charge:

"So they then claim that the testimony has been offered tending to prove that the husband of Maria Kohanczo was not at the time he applied for membership, a Roman or Greek Catholic in good standing; that is, that he was not a practical member of the Greek and Roman Catholic Church.    The plaintiff insists that she was.    They say that her husband was not in good standing at that time in either church, and testimony has been offered tending to prove that he had not performed his religious duties and that he was not eligible, and would not have been received had the truth been known.    In other words, that he falsely represented; that they relied on the representations; he was admitted to the society; they were deceived and injured thereby."

It will be noticed by this language that the fact that the husband was not a member of the church or made false representations when becoming a member, might in some way affect the wife, which, of course, could not be true, unless the false rep-

resentations made were false representations as to the wife. What was said would be applicable if it were a claim based upon the husband's membership, but this suit was based upon the membership of the wife, and if there is an objection to this, it is because it might mislead the jury to the extent of thinking that the wife's membership depended upon that of her husband, which would not be true.

The judgment in this case is reversed, because the verdict is against the weight of the evidence, and a motion for a new trial should have been sustained for that reason.

*W. H. Schwartz, Hart, Canfield & Croke,* for plaintiffs in error.

*M. B. Putney,* for defendants in error.

---

## SMOKE AND GASES FROM BRICK KILNS.

[Circuit Court of Carroll County.]

ANGELINE DOWNS V. THE GREER BEATTY CLAY COMPANY.

Decided, October Term, 1906.

*Nuisance—From Burning Brick and Hollow Ware Kilns—Injunction against, on Petition of Surrounding Property Owners—Will be Refused, When—Relative Effect upon the Parties—Equitable Jurisdiction—Remedy at Law.*

1. The business of burning brick is a lawful one and whether or not it is a private nuisance depends upon the circumstances of each particular case.

2. A court of equity will not ordinarily grant an injunction to restrain the prosecution of a lawful business on the ground that it is a private nuisance until the plaintiff has established his right, by an action at law.

3. Where a business complained of as a nuisance is a permanent one, and the damages to adjoining property can be ascertained with reasonable certainty and assessed *in solido* to the complaining party, such business will not be enjoined where an injunction would be ruinous to the business of the defendant and of small benefit to the plaintiff.